**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SECURITIES & EXCHANGE COMMISSION,

                        Plaintiff,

        -against-                                    **REPORT AND RECOMMENDATION**

GREGORY ALTIERI,
                        Defendant.                      **20-CV-06343 (JS) (ST)**


------------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

        On December 30, 2020, Plaintiff Securities & Exchange Commission ("SEC" or

"Commission") filed a Complaint against Defendant Gregory Altieri ("Defendant" or "Altieri")

alleging that Defendant operated a Ponzi scheme in which he fraudulent raised approximately

$69 million from investors.  In April 2021, the Commission notified the Court that it had reached

a partial resolution of the case on the issue of liability and the Court entered the Partial Judgment

upon Defendant's consent.

        Now before this Court is the SEC's Motion for Monetary Relief to recover disgorgement

of all ill-gotten gains, prejudgment interest, and a civil penalty.

        On October 31, 2022, The Honorable Joanna Seybert referred SEC's Motion to the

undersigned to issue a Report and Recommendation.

        For the reasons states below, this Court respectfully recommends that the SEC's Motion

be GRANTED.

## I.     BACKGROUND

### A.  Facts

The Complaint alleges that Altieri defrauded over 80 investors—most of whom were retired New York police officers and firefighters—of over $69 million.  SEC's Mot., Mem of Law at 1, DE 29.  The allegations in the Complaint are accepted as true pursuant to the Partial Judgment entered by the Court on April 20, 2021.  The Partial Judgment ordered:

> (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure

Consent Judgment, DE 15.  The allegations in the Complaint, accepted as true, are as follows:

In approximately 2006, Defendant established his own company, LNA Associates, Ltd. ("LNA") to purportedly engage in the wholesale purchase and resale of jewelry to corporate and individual customers.  *See* Compl., DE 1 ¶ 15.  In approximately 2015, Altieri began soliciting prospective investors for LNA.  *Id.* ¶ 16.  Altieri told these prospective investors that he was raising funds to participate in a new opportunity in the closeout sector of the jewelry business, which involved purchasing jewelry in bulk at a discount or "closeout" price and then reselling that jewelry at a significant profit.  *Id.*  Altieri offered these prospective investors a 15% return on their investment.  *Id.*

In approximately August 2017, Altieri began soliciting current and retired police officers and firefighters in the New York area through his relationship with a retired police officer who

also became an investor of Altieri's.  *Id*. ¶ 19.

Altieri promised prospective investors that they would receive a sum certain in return for their investment within a time frame of approximately 30 and 150 days.  *Id*. ¶ 23.  Some prospective investors were presented with a document, at times referred to as a "lot sheet," prior to making their investment.  *Id*. ¶ 24.  The lot sheet identified available investments and proposed return on specific investment amounts with varying returns.  *Id*. ¶¶ 25-26.  Two examples of the lot sheets include:

a. One lot sheet identified 91 specific investment opportunities, ranging from

between $11,000 and $2,041,000.  The $11,000 investments offered returns of

$15,000, representing a profit of 36%.  A single $2,041,000 investment offered a

return of $3,000,000, representing a profit of 47%.  *Id*. ¶ 27.

b. Another lot sheet offered 74 specific investment opportunities, ranging from

$32,000 to $7,500,000.  The $32,000 investments offered returns of $44,000,

representing a profit of 37.5%.  The single $7,500,000 investment offered a return

of $15,500,000, representing a profit of 107%.  *Id*. ¶ 28.

Altieri also issued "notes" to some investors, which reflected the basic terms of the investments, including the amount invested, the amount of profit to be paid, and the date by which the investor was to receive his or her principal and return on principal.  *Id*. ¶ 31.  Between 2017 and 2019, the promised rate of return on an investor's initial investment ranged from approximately 30% to over 100%.  *Id*. ¶ 32.  Some of the notes stated that they were being issued for the purpose of investing in closeout jewelry sales.  *Id*. ¶ 33.  The stated maturity dates of the notes were generally between 30 and 150 days.  *Id*. ¶ 34.  Some notes issued in 2017 and part of 2018 included late payment provisions, where Altieri agreed to pay an additional sum, in some

cases totaling $5,000, if the note was not repaid with profit within 30 days of the maturity date. *Id*. ¶35.  The late payment provisions were removed from the terms in 2018.  *Id*. ¶ 36.

Between 2017 and 2019, Altieri raised at least $69.5 million from at least 80 investors in connection with his Ponzi scheme.  *Id*. ¶ 44.  In 2018 and 2019, Altieri obtained approximately $46.3 million from lenders including Merchant Cash Advance ("MCA") providers and agreed to pay interest of 40% to 50% on these funds.  *Id*. ¶¶ 46, 54-55.  Altieri commingled the funds he received from investors with the funds he received from MCA providers and then used these commingled funds to repay investors.  *Id*. ¶ 45.  Overall, Altieri used approximately $66 million of LNA's funds to pay investors and approximately $19.4 million of LNA's funds to repay MCA providers.  *Id*. ¶ 47.

Altieri also misappropriated LNA's funds for his personal use.  *Id*. ¶ 48.  Between 2017 and 2019, Altieri withdrew at least $1.4 million in cash from LNA's primary banking account and, in addition, cashed over $1.9 million in investor checks at a check-cashing service.  *Id*. Moreover, Altieri used more than $500,000 of LNA's funds to pay his personal expenses and used approximately $1.3 million of LNA's funds to purchase real estate for an acquaintance affiliated with an MCA provider.  *Id*. ¶¶ 49-50.

Altieri represented to investors that: (i) their investments were safe and that investors were receiving principal and profit on their investment even if there were delays with payment; (ii) their investments would be used to acquire closeout jewelry that would then be resold to Altieri's contacts in the jewelry industry at significant profits; (iii) he and his family members were investors in LNA; (iv) his jewelry closeout business was legitimate; (v) the business was running smoothly; (vi) the jewelry had been purchased and sold; (vii) the investors would be paid in full, and (viii) the delays in payment were being caused by the jewelry brokers and

4

dealers to whom Altieri had sold the jewelry. *Id*. ¶¶ 29, 38-39, 41-42, 51. These representations were false. *Id*. Altieri knew that his jewelry closeout business did not exist and that he had never purchased or sold any jewelry that was the subject of the investors' investments. *Id*. Instead, Altieri made Ponzi-like payments to earlier investors, using later investors' and MCA providers' funds. *Id*. ¶¶ 53-57.

In December 2019, Altieri signed a confession of judgment acknowledging a debt of approximately $70 million to one MCA provider. *Id*. ¶ 58. Moreover, in 2018, a group of investors commenced an involuntary proceeding against Altieri under Chapter 7 of the Bankruptcy Code, with claims exceeding $100 million. *Id*. ¶ 59. Despite this, even in 2019 and early 2020, Altieri continued to assure investors that his jewelry business was operating and that, while there were delays in his receipt of funds from his counterparties, he would be able to pay investors in full. *Id*. ¶ 61.

**B. Procedural History**

On December 30, 2020, the Commission filed a complaint, alleging that Altieri, through LNA, operated a fraudulent Ponzi scheme in which he raised approximately $69 million from at least 80 investors in the New York area and from MCA providers. *Id*. ¶ 1.

As a result of Altieri's conduct described in the Complaint, the Commission charged Altieri with violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77 q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. *Id*.

On March 16, 2021, Altieri filed an Answer to the Complaint. DE 10. On April 15,2021, the Commission notified the Court that it had reached a partial resolution of the case and requested the entry of the Partial Judgment against Altieri as a result of the parties' settlement

regarding the issue of liability.  DE 13.  On April 20, 2021, the Court entered the Partial

Judgment upon Altieri's consent.  DE 15.

      The Partial Judgment: (i) enjoined Altieri from violating any of the provisions of the

securities laws described in the Complaint; (ii) ordered that Altieri "shall pay disgorgement of

ill-gotten gains, prejudgment interest thereon, and a civil penalty;" (iii) ordered that "[t]he Court

shall determine the amounts of the disgorgement and civil penalty upon motion of the

Commission;" and (iv) ordered that "[p]rejudgment interest shall be calculated based on the rate

of interest used by the Internal Revenue Service for the underpayment of federal income tax as

set forth in 26 U.S.C. § 6621(a)(2)."  DE 15.

## II.     DISCUSSION

### A.      Defendant Should Disgorge the Ill-Gained Profits

      The SEC seeks the disgorgement of ill-gotten gains from Defendant.

      Disgorgement of illegally obtained profits is an appropriate remedy for violations of the

securities laws.  *See SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert. denied*, 486 U.S.

1014 (1988).  Its primary purpose "is to deprive violators of their ill-gotten gains, thereby

effectuating the deterrence objectives of" the securities laws.  *SEC v. First Jersey Securities,*

*Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).  Disgorgement has

long been viewed as an equitable remedy ordered "to 'deprive . . . defendants of their profits in

order to remove any monetary reward for violating' securities laws and to 'protect the investing

public by providing an effective deterrent to future violations.'"  *See Kokesh v. SEC*, -- U.S. --,

137 S.Ct. 1635, 1640 (2017); *SEC v. Texas Gulf Sulphur Co.*, 312 F. Supp. 77, 92 (S.D.N.Y.

1970), aff'd in part, rev'd in part, 446 F.2d 1301 (2d Cir. 1971)); *see SEC v. Contorinis*, 743 F.3d

296, 306 (2d Cir. 2014).

Courts have wide discretion to determine whether disgorgement is appropriate and the amount that should be disgorged; "in setting the disgorgement amount, a court must focus on the extent to which a defendant has profited from his [illegal conduct]." *Securities and Exchange Commission v. Carrillo Huettel LLP*, 13 Civ. 1735 (GBD) (JCF), 2017 WL 213067 at 7 Jan. 17, 2017) (internal quotation marks and citation omitted). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation, [and] any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *First Jersey Sec., Inc.*, 101 F.3d at 1475 (2d Cir. 1996) (internal quotation marks and citations omitted). The defendant's financial condition is not material to assessing disgorgement. *See SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at 4 (S.D.N.Y. Aug. 23, 2002). "[T]o withhold the remedy of disgorgement or penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws." *Id.*

Once the Commission has met its burden of presenting a reasonable approximation of profits causally connected to the violation, "the burden shifts to the defendant[ ] to contest the Government's calculations." *SEC v. Juno Mother Earth Asset Mgmt., L.L.C.*, No. 11 Civ. 01778, 2014 WL 1325912, at 2 (S.D.N.Y. Mar. 31, 2014).

Here, the SEC seeks disgorgement of the investor money from Defendant. Based on bank records and other information the Commission received during its investigation, the Commission has reasonably approximated that Altieri received funds totaling $94,241,307.00 from investors between 2016 and 2020. *See* Fine Decl. ¶ 9, DE 28-1. Altieri also received approximately $46,556,305.74 from lenders, including MCA providers, between 2016 and 2020. *Id.* ¶ 10. These funds were deposited in several bank accounts that Altieri owned and/or

controlled.  *Id*. ¶¶ 6-7.  Altieri repaid $109,320,575.40 to investors and $20,660,989.44 to MCA providers in profit and interest, respectively.  *Id*. ¶¶ 12- 13.  While virtually all of Altieri's personal living expenses were paid from LNA accounts, the Commission was unable to identify any legitimate business expenses associated with Altieri's non-existent jewelry business.  *Id*. ¶ 14-15.  Accordingly, SEC requests that Altieri should be ordered to pay total disgorgement of $10,816,047.90 because this amount represents a reasonable approximation of Altieri's ill-gotten net profits, and Altieri bears any risk of uncertainty in calculating the disgorgement amount because his illegal conduct created the uncertainty.  *Id*. ¶ 18; *see also SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995).

Thus, this Court respectfully recommends that Defendant should pay a total disgorgement of $10,816,047.90.

### B.    Defendant Should Pay the Pre-Judgment Interest

In addition to disgorgement of ill-gotten gains, the SEC seeks prejudgment interest from Defendant.

The purpose of ordering payment of prejudgment interest is to deprive the wrongdoer of the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see also SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (prejudgment interest can be awarded in addition to disgorgement to deprive a defendant of the time value of money).  As with the award of disgorgement, the Court has broad discretion whether to grant prejudgment interest and what rate to use for calculation.  *See First Jersey*, 101 F.3d at 1476-77 (using IRS underpayment rate); 17 C.F.R. §201.600(b) (SEC Rule of Practice states that prejudgment interest is computed at IRS underpayment rate, compounded quarterly).

The Commission has calculated the prejudgment interest Altieri owes on the disgorgement amount sought. Fine Decl. ¶ 20. To calculate the interest, the Commission used the IRS rate of interest on tax underpayments and refunds. *Id.* Based on a principal disgorgement amount of $10,816,047.90, application of the tax underpayment rate from January 1, 2017, through June 30, 2020—the last date investor funds were deposited in LNA's bank accounts—the total amount of pre-judgment interest is $1,648,890.31. *Id.* ¶ 21.

Since Defendant benefitted from the illicit payments, he should repay an approximation of the interest so that it may be returned to defrauded investors. *See SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014); *SEC v. Boock*, No. 09 Civ 8261, 2012 WL 3133638, 5 (S.D.N.Y. Aug. 2, 2012).

Thus, this Court respectfully recommends that Defendant should pay prejudgment interest of $1,648,890.31.

### C.    Defendant Should Pay a Civil Penalty

The SEC also seeks a civil penalty from Defendant.

The civil penalties authorized by the securities laws serve a dual purpose: to punish the individual violator for his past violations and deter future violations of the securities laws. *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (citation omitted) (imposing third-tier civil penalties); *see also SEC v. Ramoil Mgmt., Ltd.*, No. 01-cv-9057(SC), 2007 WL 3146943, at 13 (S.D.N.Y. Oct. 25, 2007) (civil penalties "fulfill a number of other [nonpunitive] purposes such as . . . deterrence, fostering public confidence in the securities system, and promoting stability in the securities market").

Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties for violations of the securities laws. *See* Securities Act Section 20(d), 15 U.S.C § 77t(d);

Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3). A first-tier penalty may be imposed for any violation; a second-tier penalty is appropriate if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and a third-tier penalty is appropriate if, in addition to meeting the requirements for imposition of a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1564 (2014) (affirming imposition of third-tier civil penalties and citing 15 U.S.C. §§ 77t(d)(2)(A-C); 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)).

"District courts have discretion in determining the appropriate amount of any penalty" imposed under the federal securities laws. *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), aff'd sub nom. *SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). Courts have discretion in selecting the method used to calculate a penalty, including using the gross amount of pecuniary gain to the defendant or multiplying the statutory tier amount by the number of violations that the Court finds the defendant committed. *See, e.g., SEC v. Cavanagh*, No. 98 Civ. 1818, 2004 WL 1594818, at 31 (S.D.N.Y. July 16, 2004) (multiplying number of fraudulent sales or offers to sell by the number of statutes violated to compute maximum penalty amount); *SEC v. Coates*, 137 F. Supp. 2d 413, 424, 430 (S.D.N.Y. 2001) (holding misrepresentations of separate facts in communications with investors constituted distinct violations); *SEC v. Milan Cap. Group, Inc*., No. 00 Civ. 0108, 2001 WL 921169, at 3 (S.D.N.Y. Aug. 14, 2001) (holding defendants who sent false offering materials to 200 investors committed "at least 200 violations of the Exchange Act"). 12

Factors that courts consider in determining whether penalties should be imposed, and the amount of the penalty include: (1) the egregiousness of the defendant's conduct; (2) the degree

of the defendant's scienter; (3) whether the defendant's conduct created substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Opulentica*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). Although a court may take defendants' current financial condition into account in considering a civil money penalty, "a defendant's claims of poverty cannot defeat the imposition of a civil penalty by a court." *SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293, at 4 (S.D.N.Y. Mar. 31, 2003) ("If the defendant is indeed impecunious, the SEC will ultimately not be able to collect on the judgment…. While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty.").

Here, the third-tier penalties are appropriate given the fraudulent conduct as well as substantial losses to the investors who entrusted their money to Defendant. The SEC requests that the Court order Altieri to pay a third-tier penalty of $10,816,047.90, which represents the gross pecuniary gain Altieri received from January 1, 2016, through March 5, 2020 (the date of the most recent transaction in bank accounts associated with Altieri). Fine Decl. ¶ 19. The factors described above weigh in favor of imposing a third-tier penalty against Altieri. Taking the allegations in the Complaint as true pursuant to the Partial Judgment, Altieri defrauded over 80 investors of over $69 million. *See* SEC's Mot., Mem of Law at 1, DE 29. Most of these investors were retired New York police officers and firefighters, and likely unsophisticated. Altieri knowingly or recklessly made misrepresentations and false promises directly to these investors to induce them to invest into a non-existent jewelry business. Altieri's conduct also resulted in substantial loss to investors.

11

The third-tier penalty is warranted by Altieri's conduct, which was egregious, repeated, and created a substantial loss or risk of substantial loss to others. *Lybrand*, 281 F. Supp. 2d at 730; SEC v. Rust, No. 16 Civ. 3573, 2021 WL 2850615 (S.D.N.Y. July 8, 2021) (third-tier penalty appropriate where defendant made misrepresentations to clients, used client funds to pay others and caused losses over $6 million to clients). The penalty will also serve to appropriately punish Altieri and deter any future fraudulent activities. *SEC v. Forest Res. Mgmt. Corp.*, No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at 2 (S.D.N.Y. May 18, 2010).

Thus, this Court recommends that Defendant should pay a civil penalty of $10,816,047.90.

## III.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends that the SEC's Motion for Monetary Relief be granted. More specifically, this Court recommends that Defendant should pay disgorgement of $10,816,047.90, pre-judgment interest of $1,648,890.31, and a civil penalty of $10,816,047.90.

## IV.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46

(2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Central Islip, New York
       December 9, 2022